IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ANDREW BAKER,                    :
        Plaintiff
                                 :

        vs.                      :      CIVIL NO. 1:CV-06-0932

                                 :
BOROUGH OF PORT ROYAL,
PENNSYLVANIA,                    :
        Defendant


M E M O R A N D U M


*I.    Introduction*

        We are considering the converted motion for summary
judgment of the Defendant, Borough of Port Royal ("Port Royal").
Plaintiff, Andrew Baker ("Baker"), a former Port Royal police
officer, filed this lawsuit pursuant to 42 U.S.C. § 1983
claiming that Port Royal violated his due process rights by
abolishing its police force in bad faith to avoid providing a
hearing before removing him from office.  Upon review of the
briefs as well as the record, we will grant summary judgment to
Port Royal.


*II.   Background*

        A.  Procedural History

        Baker filed a three-count complaint (doc. 1) pursuant
to 42 U.S.C. § 1983.  Baker's claim is based on his alleged

Fourteenth Amendment property interest in employment as a police officer.  Baker amended his complaint to remove the third count which sought a writ of mandamus requiring Port Royal to reestablish its police force, reinstate him, and pay damages.

Port Royal moved to dismiss Baker's complaint for failing to state a claim upon which relief could be granted. (doc. 7).  After concluding that we could not decide the motion to dismiss without referring to the content of its attached exhibits, we converted the motion to one for summary judgment pursuant to Federal Rule of Civil Procedure 12(b).  (doc. 17). In doing so, we provided notice to the parties, granted a period for discovery, and allowed each party to submit a supplemental brief and other evidentiary materials.  *Id.*

After conducting discovery, each party filed a supplemental brief, statement of material facts, and appendix of exhibits.  (docs. 23-27).  Shortly thereafter, we ordered the parties to submit a second round of supplemental briefs addressing the affidavit of Officer Kent A. Smith, submitted in support of Baker's opposition to Port Royal's motion for summary judgment.  (doc. 28).  Both parties submitted a second round of briefs and supporting exhibits, (docs. 31, 32, 33) and the motion is now ripe for our review.

2

B.  *Factual Background*

1.  Police Services in Port Royal

Baker was employed by Port Royal as a regular, full-time police officer.  Port Royal Statement of Material Facts ("PR SMF"), ¶ 1.  In 2003, the Port Royal Police Department provided police services within the Borough, as well as Fermanagh Township and Mifflintown Borough through a contract with each municipality.  *Id.* ¶ 2.  The Port Royal Police Department had two full-time officers, Baker and Richard Curran, as well one part-time officer, Mary Woods.  *Id.* ¶ 3.  At some point in 2003, Richard Curran resigned and Mary Woods was named as a full-time officer.  *Id.* ¶ 4.[1]

2.  Port Royal Abolishes its Police Force

The path toward abolition of the Port Royal Police Department began in 2004.  In early 2004, Port Royal's monthly distribution of police coverage included: 140 hours of police coverage to Port Royal, 100 hours of coverage to Mifflintown Borough, and 80 hours of coverage to Fermanagh Township, a total of 320 hours per month.  Baker SMF ¶ 7.  Effective January 12, 2004, Fermanagh Township terminated its contract with Port Royal for police services, citing financial concerns.  PR SMF ¶ 5. Fermanagh's decision cost Port Royal $25,920 in anticipated

---

[1]  According to Baker, although Curran resigned, Port Royal neither filled nor eliminated his position. (doc. 1, ¶ 7).  As a result, Baker claims that the police department consisted of three positions when Port Royal abolished it.  *See id.* ¶ 13.

revenue.  *Id.*; Baker SMF, ¶ 5.  Port Royal, however, continued to fund the police department through its General Fund, albeit without the revenue from Fermanagh Township. PR SMF, ¶ 6.  Port Royal shifted the hours of police service that were previously allocated to Fermanagh to Port Royal.  Baker SMF ¶ 7. Consequently, Port Royal's police coverage increased to 220 hours per month within the borough itself, with 100 hours still allocated to Mifflintown Borough.  *Id.*

Port Royal took additional steps in response to the loss of revenue from the Fermanagh Township contract.  On May 5, 2004, the Borough Council voted to reduce police coverage in Port Royal by 80 hours per month, effective June 1, 2004.  PR SMF ¶ 7; Baker SMF ¶ 7.  Port Royal accomplished this by reducing the hours of Mary Woods, the less-senior officer.  PR SMF ¶ 8.  Second, Baker and Woods contacted neighboring municipalities in an attempt to obtain a contract to provide police services and recoup some of the lost revenue.  *Id.* ¶ 9; Baker SMF ¶ 9.  Third, Port Royal Borough Council voted to increase the hourly rate for police services charged to Mifflintown Borough, from $27 per hour to $40 per hour.  *Id.* ¶ 10.

On June 17, 2004, however, Mifflintown Borough informed Port Royal of its intention to terminate its police services contract, effective August 1, 2004.  *Id.* ¶ 11.  A few weeks later, at a July 7, 2004, Port Royal Borough Council

meeting, a Councilman "presented a motion to cut the Borough's police department to zero hours for Mifflintown Borough and Port Royal Borough, effective August 1, 2004." *Id*. ¶ 12.  This motion passed and "had the effect of abolishing the Port Royal Police Department."  Baker SMF ¶ 13.

> 3.   Law Enforcement Services After Port Royal
>      Abolished the Police Department

After Port Royal abolished its police department, it sold all of the police equipment.  PR SMF ¶ 21.  By default, the Pennsylvania State Police began to provide law enforcement services to Port Royal, *Id*. ¶ 22; however, the State Police do not enforce local ordinances, a job formerly handled by the Port Royal Police Department.  Baker SMF ¶ 22.

Sometime after Port Royal abolished the police department, Barbara Bergstresser, the Mayor of Port Royal, and other members of the Borough Council contacted neighboring municipalities and their police officers concerning the purchase of police services for Port Royal.  Baker SMF ¶ 23; doc. 31, p. 2.  Their efforts, however, were unsuccessful.  doc. 31, p. 3. Nonetheless, Port Royal allocated $3,000 toward "police" in its 2006 budget.  Baker SMF ¶ 26.

One of the individuals contacted by Port Royal officials was Officer Kent Smith, the Chief of Police of Mifflintown Borough.  According to Smith, "about the time that Port Royal disbanded its Police Department, [he] was contacted

by Port Royal about providing police services for Port Royal."
(doc. 27, ex. N).  Smith claims that he met with Councilmen
Bernie Peck, James Bryner, Brooks Gamble, and Mayor Barbara
Bergstresser.  *Id*.  According to Smith, although he was actually
sworn in as a police officer for Port Royal, "it did not work
out" and his tenure was "very short."  *Id*.  However, sometime
thereafter, the same Port Royal officials tried to purchase
police services from Mifflintown Borough.  *Id*.

        The parties have provided additional facts in response
to our Order requiring briefing on Smith's affidavit.  *See* doc.
28.  Port Royal contends that Smith was only offered a position
as a Code Enforcement Officer[2] and although he was sworn in to
that position, he never actually provided services to Port
Royal.  (doc. 31, p. 2-3).  Furthermore, while Port Royal
concedes that it approached Mifflintown's Borough Council about
purchasing ten hours of police services per month, Port Royal
never obtained the services.  *Id*. at 3.

        In response, Baker contends that Port Royal officials
sought to purchase ten hours of police services per month from
Mifflintown with the possibility of purchasing more the
following year.  (doc. 33, p. 4).  Baker also notes that the

---

        [2]  Port Royal appears to use "Ordinance Enforcement
Officer" and "Code Enforcement Officer" interchangeably when
referring to the position of Smith and Langan.  We will refer to
the position as a Code Enforcement Officer for consistency.

August 13, 2005, Borough Council minutes state that the Borough
Council voted to hire Smith as a "Police Officer." *Id.* at 5.

On September 9, 2006, the Borough Council hired John
Langan to act as a Code Enforcement Officer on an as-needed
basis.  PR SMF ¶ 27.  Port Royal hired Langan because the mayor,
who ordinarily provided ordinance enforcement services, was
unable to devote the necessary time to the task.  *Id.* ¶¶ 24, 26.
Since he began working for Port Royal Langan has not worked more
than eight and one-half (8.5) hours in any month.  PR SMF ¶ 29.
Langan does not wear a uniform, possess a weapon, or drive a
vehicle supplied by Port Royal.  *Id.* ¶¶ 30, 31.  Additionally,
he has no arrest power or authority to enforce traffic laws or
the Pennsylvania Crimes Code.  *Id.* ¶ 30.  Langan's duties
"consist only of enforcing Borough of Port Royal ordinance
provisions and issuing citations for violations of Borough
ordinances." *Id.* ¶ 32.

C.  *Baker's Claim Against Port Royal*

Baker filed this § 1983 action claiming that Port
Royal abolished its police department "in bad faith to avoid the
necessity of providing him with a due process hearing."  (doc.
15, p. 4).  Specifically, Baker contends that Port Royal
deprived him of a property interest by abolishing the police
department and claiming that the decision was based on financial
concerns.  (doc. 1, ¶¶ 17, 18, 27, 28).  According to Baker,
Port Royal's true motivation was to remove him from his position

without providing a hearing that would be required by statute. Baker alleges that Port Royal's actions violated his Fourteenth Amendment due process rights. *Id.* ¶¶ 18, 28.

In response, Port Royal argues that while Baker may have been protected from removal without "just cause," Port Royal's decision to abolish its entire police department does not trigger the property right established by the two applicable Pennsylvania employment statutes. (doc. 8, p. 11). Additionally, Port Royal claims that it had a legitimate, cost-saving basis for its decision and it did not subsequently recreate Baker's job or the police department. *Id.* at 15.

III. *Discussion*

A. *Standard of Review*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, we may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In reviewing the evidence, we must construe facts and inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d

8

538, 553 (1986).  Summary judgment must be entered for the
moving party "[w]here the record taken as a whole could not lead
a rational trier of fact to find for the non-moving party."  *Id.*
at 586-87 (citations omitted).

The moving party bears the initial responsibility of
stating the basis for its motion and identifying portions of the
record which demonstrate the absence of a genuine issue of
material fact.  *Celotex*, 477 U.S. at 323.  It can discharge that
burden by "showing . . . that there is an absence of evidence to
support the nonmoving party's case."  *Id.* at 325.

An issue is "genuine" "only if a reasonable jury,
considering the evidence presented, could find for the nonmoving
party."  *Childers v. Joseph*, 842 F.2d 689, 693-94 (3d Cir. 1988)
(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct.
2505, 91 L.Ed.2d 202 (1986)).  A fact is "material" when it
would affect the outcome of the trial under the governing law.
*Anderson*, 477 U.S. at 248.

When a moving party has carried the burden under Rule
56, the burden shifts to the nonmoving party to demonstrate that
an issue of material fact exists.  The nonmoving party "must do
more than simply show that there is some metaphysical doubt as
to the material facts."  *Matsushita*, 475 U.S. at 586-87
(citations omitted).  The nonmoving party "must present
*affirmative evidence* in order to defeat a properly supported
motion for summary judgment," and cannot "simply reassert

factually unsupported allegations contained in [the] pleadings."
*Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir.
1989) (citation omitted).  "If the [nonmoving party's] evidence
is merely colorable, or is not significantly probative, summary
judgment may be granted."  *Anderson*, 477 U.S. at 249-50
(citations omitted).  Factual averments in briefs do not satisfy
the nonmoving party's burden.  *Harter v. GAF Corp.*, 967 F.2d
846, 852 (3d Cir. 1992).

> B.  *Baker's § 1983 Claim*

42 U.S.C. § 1983 does not create substantive rights
but rather serves as a method to vindicate federal rights
conferred elsewhere.  *Baker v. McCollan*, 443 U.S. 137, 144 n.3,
99 S.Ct. 2689, 61 L.Ed.2d 433 (1979).  A plaintiff pursuing a §
1983 claim "must show that the defendants, acting under color of
law, violated the plaintiff's federal constitutional or
statutory rights, and thereby caused the complained of injury."
*Elmore v. Cleary*, 399 F.3d 279, 281 (3d Cir. 2005) (citing
*Sameric Corp. of Del., Inc. v. City of Phila.*, 142 F.3d 582, 590
(3d Cir. 1998)).  The Fourteenth Amendment prohibits a state
from depriving one's "life, liberty, or property, without due
process of law."  U.S. Const. amend. XIV, § 1.  An employee may
hold a property interest in employment and, if so, must be
afforded due process protections prior to discharge.  *Cleveland
Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487,
84 L.Ed.2d 494 (1985).  We look to state law in considering

10

whether a party had a property interest in employment. *Elmore*, 399 F.3d at 282. "Property interests are not created by the Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent sources such as state law . . . .'" *Loudermill*, 470 U.S. at 538 (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)).

A state-law provision may create a property right when it requires "just cause" prior to the termination or demotion of an employee. *See id*. at 538-39. Baker contends that his property interest in employment comes from either the Pennsylvania Borough Code, 53 P.S. § 46171, *et seq.*, or the Police Tenure Act, 53 P.S. § 811, *et. seq.* The applicable statute depends on the number of officers employed by Port Royal at the time of its dissolution. The Pennsylvania Borough Code, applicable to a borough with a police force of three or more officers, *see* 53 P.S. § 46171, provides:

> No person employed in any police or fire force of any borough shall be suspended, removed or reduced in rank except for the following reasons:
>
> (1) Physical or mental disability affecting his ability to continue in service, in which cases the person shall receive an honorable discharge from service.
>
> (2) Neglect or violation of any official duty.
>
> (3) Violation of any law which provided that such violation constitutes a misdemeanor or felony.

> (4) Inefficiency, neglect, intemperance,
> immorality, disobedience of orders, or
> conduct unbecoming an officer.
>
> (5) Intoxication while on duty.
>
> (6) Engaging or participating in conducting
> of any political or election campaign
> otherwise than to exercise his own right of
> suffrage.

53 P.S. § 46190.  Section 46191 provides for a hearing upon

suspension or removal:

> If the person suspended, removed or reduced
> in rank shall demand a hearing by the
> commission, the demand shall be made to the
> commission. Such person may make written
> answers to any charges filed against him not
> later than the day fixed for hearing. The
> commission shall grant him a hearing which
> shall be held within a period of ten days
> from the filing of charges in writing,
> unless continued by the commission for cause
> at the request of the council or the
> accused. At any such hearing, the person
> against whom the charges are made may be
> present in person and by counsel.

Similarly, the Police Tenure Act, applicable to Pennsylvania

boroughs with a police force of fewer than three members, 53

P.S. § 811, provides, in relevant part:

> **§ 812. Removals**
> No person employed as a regular full time
> police officer in any police department of
> any township of the second class, or any
> borough or township of the first class
> within the scope of this act . . . shall be
> suspended, removed or reduced in rank except
> for the following reasons: (1) physical or
> mental disability affecting his ability to
> continue in service, in which case the
> person shall receive an honorable discharge
> from service; (2) neglect or violation of
> any official duty; (3) violating of any law

which provides that such violation
constitutes a misdemeanor or felony; (4)
inefficiency, neglect, intemperance,
disobedience of orders, or conduct
unbecoming an officer; (5) intoxication
while on duty.  A person so employed shall
not be removed for religious, racial or
political reasons.  A written statement of
any charges made against any person so
employed shall be furnished to such person
within five days after the same are filed.

**§ 814. Hearings on dismissals**
If the person sought to be suspended or
removed shall demand a public hearing, the
demand shall be made to the appointing
authority. Such person may make written
answers to any charges filed against him.
The appointing authority shall grant him a
public hearing, which shall be held within a
period of ten days from the filing of
charges in writing, and written answers
thereto filed within five days . . . .

While Baker contends that it is unclear whether the Police

Tenure Act or the Borough Code applies to his claim, the parties

do not dispute that Baker, as a Port Royal police officer, was

protected by one of the statutory provisions.  The parties also

agree that the statutes are similar and the application of one

statute or the other will not affect the outcome of the claim.

*See* doc. 8, p. 11, n.2; doc. 15, p. 7.

Despite these statutory provisions, Pennsylvania

allows a municipality to engage in a governmental reorganization

which has the effect of terminating an employee's position.  *See*

*Appeal from Ordinance No. 384 of the Borough of Dale*, 382 A.2d

145, 147 (Pa. Commw. 1978) (explaining that "[t]here is no

provision in the Police Tenure Act which prohibits or limits or

13

in any way applies to the abolition of a police department").
While the Third Circuit does not appear to have considered the
issue, other courts refer to this as the "reorganization
exception." *See, e.g.*, *Misek v. City of Chicago*, 783 F.2d 98,
100 (7th Cir. 1986); *McNeil v. City of Pittsburgh*, Civ. No. 94-
1276, 1997 U.S. Dist. LEXIS 2034, at *15 (W.D. Pa. Feb. 6,
1997). "Where this exception applies, it circumscribes the
employee's substantive property right." *Campana v. City of
Greenfield*, 164 F. Supp.2d 1078, 1092 (E.D. Wis. 2001).

Although many courts recognize a municipality's right
to reorganize or abolish a department, an employee may challenge
the reorganization. *See, e.g.*, *Misek*, 783 F.2d at 100-101.
Allowing such a challenge prevents government officials from
merely citing "reorganization" to circumvent the statutory
protections enjoyed by certain employees. *Id*. In Pennsylvania,
a former employee can challenge a reorganization or abolition of
a position or office by showing that the municipality's actions
were "a mere pretense or subterfuge." *Twp. of Perkiomen v.
Mest*, 522 A.2d 516, 520 (Pa. 1987).

The employee's challenge, however, is not without
limit. "State law may impose limitations on the extent to which
an employee can challenge an alleged reorganization." *Campana*,
164 F. Supp.2d at 1093 (citing *Misek*, 783 F.2d at 101). The
Pennsylvania Supreme Court has held that a showing that the
reorganization was a pretense or subterfuge is restricted to

demonstrating that (1) the position or department was eliminated to circumvent a court order requiring reinstatement of an employee, or (2) the eliminated position or department was subsequently recreated.  *Mest*, 522 A.2d at 520.  Baker's § 1983 claim is based on the second limitation.

The Pennsylvania Supreme Court discussed this limitation in *Carey v. City of Altoona*, 16 A.2d 1 (Pa. 1940).  In *Carey*, a police chief was demoted through a municipal enactment that reorganized the police department, effectively eliminating the police chief's position.  *Id*. at 2.  The Pennsylvania Supreme Court, in examining the municipality's decision, explained: "[W]hatever be the language of the enactment purporting to effect the abolition, if the office is substantially recreated, though under a different name, with a new appointee performing the same duties as the prior incumbent, the court will invalidate such legislation as being nothing more than a pretense." *Id*.  But the court rejected the former chief's claim, concluding:

> [W]here, as here, the position and its
> emoluments are wholly and unquestionably
> abolished, and no new rank in the police
> force, either in name or substance, is
> created similar to that which is being
> discontinued, it is not for a court to say
> that the motive underlying the enactment of
> the ordinance may have been personal or
> political rather than a disinterested desire
> to further the public welfare.  *Id*.

Similarly, in *Mest*, the court considered a claim by former police officers that the municipality disbanded the

15

police department in bad faith.  Despite evidence showing that

the economic reasons cited by the municipality were a pretext

for removing the police chief, the court reaffirmed its holding

from *Carey* and explained:

> The rule that emerges from these cases is
> that the courts should only look for bad
> faith or improper motives in the
> discontinuance of the job of police chief by
> a municipality where the abolition was a
> mere pretense or subterfuge.  The pretense
> or subterfuge must have been designed to
> evade a court order, or be evidenced by the
> recreation of substantially the same job
> under a different name or title.  *Id*. at
> 520.

Pursuant to this standard, the court reversed the trial court's

grant of mandamus, finding that the entire police department was

disbanded and that "[n]one of the jobs was substantially

recreated in any way."  *Id*.  The court emphasized the peril

inherent in judicial scrutiny of the motives of municipal

officials:

> The actions of the supervisors are fully
> reviewable by the voters.  Our courts must
> use appropriate self-restraint when asked to
> review or second-guess decisions of elected
> municipal officials.  Potential review of
> every legislative decision made in order to
> find improper personal or political motives
> would lead to government by the judiciary.
> This is not wise, and it is not the system
> provided by our Constitution.  *Id*.

With this framework in mind, we can examine Baker's

claim that Port Royal abolished its police department in bad

faith to avoid providing Baker a pre-termination hearing.  Baker

contends that Port Royal's decision to increase the hourly rate

16

charged to Mifflintown for police services was not based on economic need but rather in the hope that Mifflintown would cancel the contract. (doc. 15, p. 15). The end result, according to Baker, was that Mifflintown's cancellation provided the excuse for Port Royal to abolish its police department without giving Baker a due-process hearing. *Id.* at 16-17. Baker claims that Port Royal sought to remove him without a due-process hearing due to his child's medical condition. (doc. 27, p. 6). Specifically, Baker claims that Port Royal was concerned that the time he spent caring for his child left the borough with inadequate police protection. *Id*. at 7. Additionally, according to Baker, Port Royal believed that the cost of treating his child's medical condition would increase the borough's insurance rates. *Id.*

In addition to questioning the motive underlying Port Royal's decision to abolish the police department, Baker also contends that Port Royal later recreated its police department. In support of this claim, Baker submitted the affidavit of Kent Smith, Mifflintown Borough's Chief of Police. (doc. 27, ex. N). Sometime after the police department's abolition, three Port Royal Councilmen and its Mayor, Barbara Bergstresser, approached Smith about providing "police services" for Port Royal. *Id.* Smith claims that Bergstresser "actually swore [him] in as a police officer for Port Royal"; however, his "tenure as a police officer for Port Royal was very short"

because "[i]t did not work out." *Id*. Smith does not disclose
his powers or duties nor does he reveal how long he remained in
the position or why he left. Baker's other support for his
claim is found in the minutes of the August 13, 2005, Port Royal
Borough Council meeting. *See* doc. 32, ex. T. There, the
minutes describe a vote "to hire Kent Smith as a Police Officer
from Mifflin Borough." *Id*.

Baker's other evidence concerns unsuccessful attempts
by Port Royal officials to purchase police services from Smith
and Mifflintown Borough as well as Port Royal's budgeting for
the cost of police services. *See* doc. 27, pp. 8-9; doc. 33, p.
4. This evidence, while suggestive of Port Royal's intent to
recreate its police force, does not show that it actually did
so. Thus, it is not part of our analysis regarding whether Port
Royal "substantially recreated" the force with new officers
performing "the same duties." *See Mest*, 522 A.2d at 520.

In arguing that it did not substantially recreate its
police department, Port Royal disputes Smith's characterization
of his interaction with Port Royal officials. Minutes from a
July 9, 2005, Borough Council meeting show that Port Royal
officials intended to meet with Smith to discuss a position as a
code enforcement officer, not as a police officer. (doc. 32,
exs. O, P, S). Unsworn declarations from the Borough Council
members who met with Smith, and those who voted at an August 13,
2005, meeting, also show that he was offered a code enforcement

18

position, not that of a police officer.  *Id.* exs. O, P, Q, R, V.
Port Royal also refutes Baker's reliance on the language of the
August 13, 2005, meeting minutes indicating that the Borough
Council was to hire Smith as a police officer, explaining that
the statement appears in a paragraph titled "Code Enforcement
Officer."  (doc. 31, p. 6).

While there is a dispute regarding Officer Smith's
title and his duties during his short time with Port Royal,
other evidence shows that Port Royal did not recreate its police
department.  First, while Baker recounts various efforts by Port
Royal officials, Port Royal did not purchase police services
from Mifflintown Borough.  (doc. 31, p. 3).  Second, Port Royal
eventually hired John Langan as a Code Enforcement Officer on an
as-needed basis.  PR SMF ¶ 27.  Langan has not worked more than
eight and one-half (8.5) hours in any month since his hiring.
*Id.* ¶ 28, 29.  As a Code Enforcement Officer, Langan's powers
and duties are limited; he may only enforce Port Royal ordinance
provisions and issue citations for their violation.  *Id.* ¶ 32.
He has no weapon, uniform, or arrest powers, and he must provide
his own vehicle.  *Id.* ¶ 30.  The only function that Langan
performs which was formerly performed by Port Royal officers is
the enforcement of a certain set of ordinance provisions.  *Id.* ¶
23.[3]  Third, the Pennsylvania State Police has continuously

---

[3]  This paragraph in Port Royal's Statement of Material
Facts may be misnumbered as it follows paragraph 32.

supplied police services since the dissolution of the police
department.  PR SMF ¶ 22.

      Based on our review of the record, a reasonable jury
could not conclude that after abolishing its police department,
Port Royal substantially recreated the police department with
new officers performing the same duties.  Construing the facts
in the light most favorable to Baker, Port Royal's decision to
hire Smith for a short time to provide police services, to later
hire Langan for code enforcement, and to utilize the services of
the Pennsylvania State Police does not show that it
"substantially recreated" Baker's position or the department as
a whole.  Smith provided no detail regarding his duties as a
police officer in Port Royal and his tenure "was very short."
(doc. 27, ex. N).  Langan, as a part-time code enforcement
officer, does not have the same or similar authority or duties
as that of a full-time officer.  Finally, the use of the
Pennsylvania State Police for police services is not a
recreation of the Port Royal police force, as the state police
is statutorily bound to cooperate with counties and
municipalities in preserving law and order.  *See Youngwood
Borough Police Dep't v. Comm'r, Pa. Labor Relations Bd.*, 539
A.2d 26, 29 (Pa. Commw. 1988).

      Lacking a genuine issue as to whether Port Royal
substantially recreated its police force, Baker, pursuant to
Pennsylvania law, cannot show that Port Royal's abolition of the

police force was a "mere pretense or subterfuge."  Without this
showing, we may not inquire into the motive underlying Port
Royal's decision to abolish the police force.  *Mest*, 522 A.2d at
520.  *See also Campana*, 164 F. Supp.2d at 1093-94; *Limes-Miller
v. City of Chicago*, 773 F. Supp. 1130, 1139 (N.D. Ill. 1991).
As a result, we may not consider Baker's allegations that Port
Royal raised the rate for police services to force Mifflintown
to cancel the contract and provide Port Royal the excuse to
abolish its police department.  (doc. 33, p. 5).  Similarly,
Baker's allegation that high insurance costs due to his son's
serious medical condition brought about a pretextual abolition
of the police department may not be considered as it also
relates to Port Royal's motive.  As the Pennsylvania Supreme
Court explained in *Carey*, "unless the abolished office or
department is substantially recreated, a court may not pry into
the motives of a local legislative body."  *Mest*, 522 A.2d at 519
(discussing *Carey*).

Because we conclude that there is no genuine issue as
to whether Port Royal substantially recreated its police
department, Baker is not protected by the Police Tenure Act or
the Borough Code, whichever may apply.  Without an infringement

of a protected property right, Baker's § 1983 claim fails.
Therefore, we will grant Port Royal's motion for summary
judgment.


                                    /s/William W. Caldwell
                                    William W. Caldwell
                                    United States District Judge

Date: May 30, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


ANDREW BAKER,                          :
        Plaintiff
                                       :

        vs.                            :      CIVIL NO. 1:CV-06-0932

                                       :

BOROUGH OF PORT ROYAL,
PENNSYLVANIA,                          :
        Defendant


ORDER AND JUDGMENT


        AND NOW, this 30th day of May, 2007, upon

consideration of Defendant's (converted) Motion for Summary

Judgment, the parties' briefs, the record, and based on the

accompanying Memorandum, it is Ordered that:

        1.  Defendant's Motion for Summary
        Judgment (doc. 7) is granted and judgment is
        entered in favor of the Defendant and
        against the Plaintiff.

        2.  The Clerk of Court shall close this
        file.


                        /s/William W. Caldwell
                        William W. Caldwell
                        United States District Judge